**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CLAIRE DAY, Individually and on Behalf of All Others Similarly Situated, | **Case No.** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| FIRST SOLAR, INC., MARK R. WIDMAR, and ALEXANDER R. BRADLEY, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Claire Day ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding First Solar, Inc. ("First Solar" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired First Solar securities between February 26, 2025 and February 24, 2026, both dates inclusive (the "Class Period"),

1

seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      First Solar is a solar technology company that provides photovoltaic ("PV") solar energy solutions.  First Solar manufactures and sells PV solar modules that convert sunlight into electricity.  As relevant here, First Solar's product offerings include its Series 6 Plus PV module, manufactured at facilities in locations including Malaysia and Vietnam.

3.      At the outset of the Class Period, Defendants announced that First Solar would reduce production output of Series 6 modules at facilities in Malaysia and Vietnam in 2025, to account for circumstances including, *inter alia*, an "uncertain U.S. policy environment following the 2024 U.S. elections," and "a supply and demand imbalance for Southeast Asian product". Notwithstanding these circumstances, First Solar reassured investors that its primary market, the United States, enjoyed stable module prices.

4.      Then, on April 2, 2025, U.S. President Donald J. Trump announced a series of "reciprocal" tariffs on U.S. imports from all countries, including rates of 24% and 46% on Malaysia and Vietnam, respectively, presenting a challenge to First Solar.  These tariffs were subsequently reduced to 10%.  Throughout the Class Period, Defendants continued to assure investors that the dynamic policy landscape presented a "long term favorable" for First Solar and actually "strengthened [its] relative position in the solar manufacturing industry".

5.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants

2

had overstated First Solar's capacity to manage the impact of U.S. tariff policy on the Company's business; (ii) Defendants understated the extent to which its responses to U.S. tariff policy, including the intentional underutilization of production facilities in Malaysia and Vietnam, and attempted relocation of production to the U.S., were likely to negatively impact First Solar's projected performance in the 2026 fiscal year; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

6.     The truth began to emerge on January 7, 2026, when Jefferies downgraded First Solar to Hold from Buy, noting that during 2025, the Company had lowered guidance, faced significant de-bookings and experienced margin compression through 2025.  Jefferies also flagged that "[international] facilities remain a pain point while tariffs exist" and "underutilization at [international] facilities remains a concern."  The Jefferies analyst also predicted that First Solar's deployment opportunities were likely to be more limited in 2026.

7.     On this news, First Solar's stock price fell $27.67 per share, or 10.29%, to close at $241.11 per share on January 7, 2026.

8.     Then, on February 24, 2026, First Solar issued a press release "announc[ing] financial results for the fourth quarter and year ended December 31, 2025."  Among other items, First Solar announced earnings that missed expectations by a wide margin and issued lower-than-expected FY 2026 revenue guidance, citing customer headwinds such as permitting delays under the Trump administration.  Following First Solar's announcement, Baird Research downgraded its stock to Neutral from Outperform, citing "several question marks in forward outlook".

9.     On this news, First Solar's stock price fell $33.09 per share, or 13.61%, to close at $210.12 per share on February 25, 2026.

3

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa).  Per First Solar's most recent quarterly financial statements filed with the SEC on Form 10-Q, as of April 24, 2026, there were more than 107 million shares of the Company's publicly traded Class A common stock outstanding.  Accordingly, there are presumably hundreds, if not thousands, if not thousands, of investors in First Solar common stock located in the U.S., some of whom undoubtedly reside in this District.

14.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

15.     Plaintiff, as set forth in the attached Certification, acquired First Solar securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16.     Defendant First Solar is a Delaware corporation with principal executive offices located at 4300 East Camelback Road, Suite 220, Phoenix, Arizona 85018.  The Company's common stock trades in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "FSLR".

17.     Defendant Mark R. Widmar ("Widmar") served as First Solar's Chief Executive Officer ("CEO") at all relevant times.

18.     Defendant Alexander R. Bradley ("Bradley") served as First Solar's Chief Financial Officer ("CFO") at all relevant times.

19.     Defendants Widmar and Bradley are collectively referred to herein as the "Individual Defendants".

20.     The Individual Defendants possessed the power and authority to control the contents of First Solar's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of First Solar's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with First Solar, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

21.     First Solar and the Individual Defendants are collectively referred to herein as "Defendants".

## SUBSTANTIVE ALLEGATIONS

### Background

22.     First Solar is a solar technology company that provides PV solar energy solutions. First Solar manufactures and sells PV solar modules that convert sunlight into electricity.  As relevant here, First Solar's product offerings include its Series 6 Plus PV module, manufactured at facilities in locations including Malaysia and Vietnam.

23.     At the outset of the Class Period, Defendants announced that First Solar would reduce production output of Series 6 modules at facilities in Malaysia and Vietnam in 2025, to account for circumstances including, *inter alia*, an "uncertain U.S. policy environment following the 2024 U.S. elections," and "a supply and demand imbalance for Southeast Asian product". Notwithstanding these circumstances, First Solar reassured investors that its primary market, the United States, enjoyed stable module prices.

### Materially False and Misleading Statements

24.     The Class Period begins on February 26, 2025.  One day earlier, First Solar filed an annual report on Form 10-K with the SEC, announcing its financial results for the fourth quarter and fiscal year ended December 31, 2024, issued a press release announcing the same, and held a conference call to discuss those results (the "FY 2024 Earnings Call").  During his prepared remarks on the FY 2024 Conference Call, Defendant Widmar asserted that demand for energy in the U.S. would grow moving forward, given the U.S. federal government's economic policy platform, and that solar energy would be the most efficient way to fill that demand, stating, *inter alia*:

> A word about the overall market conditions and our policy environment. Beginning with the macro-environment, President Trump has defined an expansive economic mandate that could reshape the US economy over the next four years, particularly in terms of electricity production and consumption.  His administration's goals of

6

accelerating economic growth, reducing inflation, establishing global energy dominance, bringing American manufacturing jobs back and championing innovation, including artificial intelligence require abundant stable power generation.

Forecasts show that the US will need 128 gigawatts of new capacity by 2029 to meet high summer peak demand. And while President Trump is expected to preside over the first meaningful growth in electricity demand this century, it will not be without challenges, the most significant of which is the time it takes to expand power generation capacity and grid infrastructure. Considering the new natural gas capacity could take half a decade to come online and cost twice as much as it did five years ago, thanks to supply chain constraints, including the shortage of turbines. Large-scale nuclear power plants take more than a decade to permit, construct, and commission. While these decommissioned nuclear plants are an option, reportedly, only three assets can be economically recommissioned by 2028. And while hyped and anticipated to be quicker to deploy, small modular reactors are not expected to operate commercially at gigawatt scale before 2035. Quite simply, in order to avoid potential energy price related inflation, maintain its economic and innovation competitiveness, and secure its energy independence, the country cannot wait that long.

***Given its attributes of low cost and speed to deployment relative to other sources of energy generation, solar should clearly be a significant part of the near-term solution mix***.[1]   The administration and Congress must ensure that this unprecedented growth in power generation capacity is not deep in the country's dependence on China and that American manufacturers have access to a level playing field.

25.   As Defendant Bradley continued to introduce the Company's guidance for the 2025 fiscal year, he explained that Defendants had "deliberate[ly]" "oversold through 2026" with respect to U.S. production, and under-sold with respect to production in Malaysia and Vietnam. Defendant Bradley stated further that "in many cases" First Solar's customers "with intra-year flexibility" were "requesting deliveries in the second half of the year," which Defendants expected to "drive a back-end weighting of our full-year revenue and shipment results", stating, *inter alia*:

Excluding India, *we remain cumulatively oversold through 2026*. As previously discussed, *this oversold position is deliberate and in addition to providing us with revenue visibility in an industry that has historically experienced volatile pricing conditions provides us resilience to the uncertain timing of delivery inherent in*

_____

[1] All emphases herein have been added unless otherwise indicated.

7

*some of our larger framework contracts*, the natural tendency for delay in the project development process as well as the potential for incremental supply as we start-up and ramp new factories. . . .   [W]hilst beneficial in the longer term providing us with flexibility, the trade-off is that this over-allocation must be resolved in the near-term delivery window. . . .

*While we enter 2025 in a strong position with respect to our US production, we are in an under-allocation position for our Series 6 Malaysia and Vietnam production*. This is driven in large part by two factors, one, customers employing module delivery shift rights, and the other, the previously mentioned contract terminations that occurred in 2024.  As it relates to module delivery shift rights, as previously mentioned, multiyear framework contracts typically have less certainty over specific delivery timing. . . . *[C]ustomers with intra-year flexibility are in many cases requesting deliveries in the second half of the year, which we expect will drive a back-end weighting of our full-year revenue and shipment results*.

26.     While discussing the assumptions underlying Defendants' guidance for the 2025 fiscal year, Defendant Bradley assured investors that Defendants' "sales contracts for international product deliveries typically have some form of tariff protection", stating, *inter alia*:

[O]ur module sale contracts for international product deliveries typically have some form of tariff protection if new tariffs are imposed on the importation of modules into the US, whether in the form of First Solar termination right or tariff absorption that is either shared with the customer or exclusively borne by the customer customers.

27.     On April 2, 2025, U.S. President Donald J. Trump announced a series of "reciprocal" tariffs on U.S. imports from all countries, including rates of 24% and 46% on Malaysia and Vietnam, respectively, presenting a challenge to First Solar.  These tariffs were subsequently reduced to 10%.

28.     On April 29, 2025, First Solar filed a quarterly report on Form 10-Q with the SEC, announcing its financial results for the fiscal quarter ended March 31, 2025, issued a press release announcing the same, and held a conference call to discuss the same (the "Q1 Earnings Call"). During the Q1 Earnings Call, Defendant Widmar assured investors that "despite" certain "near term challenges" with respect to "recent policy and trade developments", Defendants "believe on

8

balance, ***the political and trade environment continues to be an overall long term favorable***", stating, *inter alia*:

> We continue to experience significant near term uncertainty from the budget reconciliation process and its potential impact on the Inflation Reduction Act, clean energy, tax credits, and now from the evolving trade landscape as the administration implements its new tariff initiatives. However, ***despite these near term challenges, we believe on balance, the political and trade environment continues to be an overall long term favorable from a First Solar perspective***. While the implementation of certain new trade policies was a possibility with the change in administration, the new tariff regime imposes — earlier this month has introduced significant challenges to 2025 that were not known at the start of the year.

29. Defendant Widmar also previewed that Defendants "may not be in a position to utilize our currently available international production capacity" due to "increased tariff exposure", stating, *inter alia*:

> [O]ur ability to optimize our U.S. production with our international production to support our customers' qualifications of the domestic content ITC bonus may be constrained under the new tariff regime. ***As we may not be in a position to utilize our currently available international production capacity, absent customers' willingness to absorb or meaningfully share the increased tariff exposure***. Our customers' willingness to bear some or all of the tariff costs beyond this module contracted obligation must be considered in the contents of the overall project-related cost increases from the new tariffs, including not just with respect to the modules but also tracker, inverters, transformers, and other imported equipment.

30. As Defendant Widmar continued, he further stated that Defendants "expect to pivot our India facility away from exports to the U.S." due to "these headwinds", and that Defendants would "continue to evaluate" the "impact of new tariffs on our Malaysia and Vietnam factories" and their "best options to optimize production across the sites in a potentially reduced U.S. demand environment". Defendant Widmar communicated that Defendants "may need to further reduce or idle production at one or both of these locations", but "***despite these near-term challenges . . . we believe the long-term outlook for solar demand . . . remains strong***", stating, *inter alia*:

> Given the majority of the best components with some dependency on Chinese supply chain, Solar Plus storage projects in particular may face significantly

increased costs. ***Given these headwinds, we expect to pivot our India facility away from exports to the U.S.*** and towards producing more product for the domestic India market. ***With regards to the impact of new tariffs on our Malaysia and Vietnam factories, we will continue to evaluate best options to optimize production across the sites in a potentially reduced U.S. demand environment for non-domestic product, but are mindful that we may need to further reduce or idle production at one or both of these locations***, especially if the announced reciprocal tariffs are put in place. ***That said, despite these near-term challenges presented by the new tariff regime, we believe the long-term outlook for solar demand, particularly in our core U.S. market remains strong, and the First Solar remains well positioned to serve this demand***.

31.    Defendant Widmar also assured investors that First Solar's "future domestic capacity expansion" would be "unencumbered by the prospects of [foreign entity of concern ("FEOC")] legislation", given its "profile as a U.S. company", and conveyed Defendants "confiden[ce]" in First Solar's "long term prospects" despite "unanticipated near term challenges" posted by tariffs, stating, *inter alia*:

> [G]iven First Solar's profile as a U.S. company, any future domestic capacity expansion would be unencumbered by the prospects of FEOC legislation, a concept based on discussions in Washington DC and elsewhere has been favorably received by certain members of the administration and Congress, and we believe must be factored into capital commitment decisions by the large majority of our prospective domestic competitors. . . .
>
> ***In summary, while we are facing unanticipated near term challenges following the imposition of the April tariff regime, we remain confident in the long term prospects for First Solar in terms of the U.S. solar energy demand and First Solar's ability to leverage its unique profile and competitive differentiation to serve this demand***. Through this confidence, we must be tethered to the continued enforcement and strengthening of the U.S. trade laws and supportive of industrial policy given the irrational and illegal Chinese trade practices. This confidence is based on our profile as America's largest and most established domestic solar module manufacturer. It's only fully vertically integrated producer. Our significant network of domestic supply chain vendors, our proprietary Cad-Tel-based semiconductor that is not beholden to the Chinese crystal and silicon industry, and our ability to enable prospects — aspects of the administration's platform of reshoring American manufacturing and supporting the powering of the next generation of critical industries.

32.      During his prepared remarks, Defendant Bradley provided an update to Defendants' financial guidance "based on expected impacts from the new tariff regime" and Defendants' assumptions baked into that guidance, including "a reduction in capacity utilization and throughput at our Malaysia and Vietnam factories beginning in Q2".  Defendant Bradley explained that "temporary idling of production" would preserve "optionality" for Defendants as they "await further updates to the tariff regime as it relates to Malaysia and Vietnam" without disclosing that this "temporary idling" could persist into the next calendar year, stating, *inter alia*:

> ***We've elected to update our financial guidance with ranges based on expected impacts from the new tariff regime***.  For the upper end of our range, we assume the impacts from the tariff policy in place as of today's call remaining through at least the end of 2025. . . .  The lower end of our range assumes the above with the addition of including the impacts from the assumption that reciprocal tariffs take effect as of July 9, namely 26%, 24%, and 46% applicable to India, Malaysia, and Vietnam respectively. . . .

> Given the tariff-related uncertainty associated with solar project's overall CapEx and the challenges of booking new volume in the current unsettled policy climate, our updated guidance removes this volume from both the high and low end of the range.  In addition, ***both the high and low end of our guidance ranges see a reduction in capacity utilization and throughput at our Malaysia and Vietnam factories beginning in Q2 to align with anticipated reduced demand for these potentially highly tariffed modules***.

> ***Temporary idling of production,*** despite the near term underutilization cost impact, approximately 40% of which is non-cash, ***provides us with optionality as we await further updates to the tariff regime as it relates to Malaysia and Vietnam***, as well as the outcome of the budget reconciliation process and any impact to the IRA. . . .

33.      Even as Defendants claimed that their decision to idle facilities in Malaysia and Vietnam helped them navigate a shifting tariff landscape, they did not discuss the possibility that these facilities could remain idle beyond 2025.  For example, during the question and answer portion of the Q1 Earnings Call, Defendant Widmar explained that idling operations in Malaysia and Vietnam was "a reflection of the fundamental economics and the headwinds we would have to deal with" if the U.S. government implemented reciprocal tariffs against those countries, but

also claimed Defendants had "chosen to just idle the facilities in the second half of the year" because that First Solar's customers could yet still absorb some of the costs of reciprocal tariffs, stating, *inter alia*:

> [O]ur guide is very much reflective of realization of tariffs are real, and they have consequences, right? . . . . [W]hen you look at the impact of those rates using Vietnam as an example, of 46%. It becomes uneconomical to ship a product with a 46% tariff into the U.S. and be able to sell that to an end customer, and our contracts with our customers are structured in such a way that the vast majority of them, there is a tariff provision in there, which is largely to protect us from a downside standpoint, right? . . . [S]o we have to negotiate once the impact of the tariffs have been determined. . . . ***Now, we could get to a better outcome with our customers***. We could also see a better outcome with revised rates on those country-specific rates, don't know. ***That's also why we've chosen to just idle the facilities in the second half of the year to understand what happens with potential change to the current country-specific rates*** . . . .

34.     On July 31, 2025, First Solar filed a quarterly report on Form 10-Q with the SEC, announcing its financial results for the quarter ended June 30, 2025, issued a press release announcing the same, and held a conference call to discuss the same (the "Q2 Earnings Call"). As during the FY 2024 Earnings Call and the Q1 Earnings Call, Defendant Widmar discussed the impact of tariffs and stated Defendants "believe that the recent policy and trade developments have, on balance, strengthen[ed] First Solar's relative position in the solar manufacturing industry, stating, *inter alia*:

> As discussed during our previous earnings call, we are not immune from adverse effects related to trade policy. Later in the call, [Defendant Bradley] will address the impact of the global tariff measures on our international production capacity, considerations as well as on our bill of material costs.
>
> ***That said, notwithstanding these headwinds***, together with the uncertainty related to the executive order [concerning construction guidance as to relevant tax credits and FEOC guidance] mentioned earlier as well as the potential implications for the recent Department of Interior directive, ordering secretary's approval of many renewable project development activities, ***we believe that the recent policy and trade developments have, on balance, strengthen[ed] First Solar's relative position in the solar manufacturing industry***.

35.    Also during the Q2 Earnings Call, Defendants announced another update to their guidance for the 2025 fiscal year.  Defendant Bradley explained this this revised, increased guidance reflected Defendants' "plan to address the resulting supply-demand imbalance through additional curtailments", including the "*potential temporary idling of production*", stating, inter alia:

> Our revised guidance incorporates the anticipated implementation of recently negotiated tariffs of 25% to Malaysia and 20% for Vietnam. . . .  ***In the event of customer terminations resulting from an inability or unwillingness to absorb tariff impacts on our international product, we plan to address the resulting supply-demand imbalance through additional curtailments, including the potential temporary idling of production***.  As such, the lower end of our guidance range reflects increased underutilization period costs and the associated loss margin tied to these volume assumptions. . . .

36.    During the question and answer portion of the Q2 Earnings Call, Defendant Widmar positioned Defendnats' decision to underutilize production facilities in Malaysia and Vietnam as a positive for First Solar, allowing Defendants to "take advantage of the manufacturing tax credit environment" in the U.S. if tariffs rendered it "uneconomic" for Defendants to import finished products from those countries, stating, inter alia:

> ***The nice thing about running Malaysia and Vietnam at lower capacity right now means there's excess tools that are available***.  That means we can go after those tools if the decision is that, as the rates have come with the announcement of the tariff rates, it really is going to be uneconomic with the continued import from those markets. ***It's going to be more beneficial for us to bring in semi-finished product, do that here in the U.S., take advantage of the manufacturing tax credit environment***.

37.    On October 30, 2025, First Solar filed a quarterly report on Form 10-Q with the SEC, announcing its financial results for the third quarter ended September 30, 2025, issued a press release announcing the same, and held a conference call to discuss those results (the "Q3 2024 Earnings Call").  During that call, Defendant Widmar disclosed that Defendants had "reduced

production in Malaysia and Vietnam", and attributed this action to "lower demand driven by" British Petroleum affiliates' decision to "default" on "multiyear agreements", stating, inter alia:

> We terminated 6.6 gigawatts of bookings under multiyear agreements defaulted on by affiliates of BP, a European oil and gas major, at a base ASP of $0.294 per watt. . . . **In Q3, we reduced production in Malaysia and Vietnam, primarily due to lower demand driven by the customer default previously mentioned**.

38.     Defendant Widmar also announced that Defendants had decided to launch a new production facility in the United States, "allowing us to onshore the finishing of Series 6 modules initiated by the company's international factories", that production would "start at the end of '26 and ramp through the first half of 2027", and that launching this new facility would "improve the gross margin profile of our sales by reducing tariff charges", without suggesting that onshoring operations would negatively affect First Solar's outlook in the coming fiscal year, stating, *inter alia*:

> We have made the decision to establish a new production facility in the United States, allowing us to onshore the finishing of Series 6 modules initiated by the company's international factories.   While the location is subject to final negotiations, we have -- with an announcement expected in the coming weeks, the planned capacity will be 3.7 gigawatts.   Production will start at the end of '26 and ramp through the first half of 2027.   As we previously noted, such an investment is expected to enable additional production in the U.S. market that we expect will be fully compliant with forthcoming FEOC guidance as well as improve the gross margin profile of our sales by reducing tariff charges and logistics costs associated with importing finished goods.

39.     When introducing Defendants' updated guidance, Defendant Bradley explained that Defendants' decision to launch a new U.S. production facility was one of three significant updates that "[drove] our revised guidance ranges today", and stated that Defendants "continue to evaluate options for our remaining Malaysia and Vietnam facilities", without disclosing that those facilities could remain underutilized throughout the 2026 fiscal year, stating, *inter alia*:

> **Three significant updates drive our revised guidance ranges today.  Firstly, the decision announced today to establish a new 3.7 gigawatts U.S. production**

*facility*, enabling us to onshore finishing for Series 6 modules initiated by our international fleet will result in approximately $330 million of total program direct spend, including approximately $260 million of capital expenditures and approximately $70 million of non-capitalized expense associated with equipment deinstallation, cleaning, packaging, shipping, import tariffs and reinstallation.

Of this, we expect an incremental $26 million of CapEx and $2 million of production start-up expense in 2025. In addition, we forecast approximately $10 million of incremental indirect charges in 2025 associated with this decision, including severance and asset impairment expenses. ***As previously noted, we continue to evaluate options for our remaining Malaysia and Vietnam facilities.*** Today's guidance excludes any additional costs associated with potential restructuring charges or asset impairments that may impact 2025 or future operating results.

40.    Later during the Q3 Earnings Call, analysts noted that the new U.S. production facility would not entirely replace the output of Defendants' production facilities in Malaysia and Vietnam. When asked "what conclusion we can draw about the underabsorption of Malaysia and Vietnam next year", Defendant Widmar stated claimed both that Defendants were in negotiations with customers who could take some of the volume from those facilities and that they "would like to find potentially" such customers, stating, *inter alia*:

> [A]s it relates to the balance of that production, one of the things we're continuing to work through and ***we are in negotiations with a couple of counterparties to almost do a bilateral for that offtake of that volume*** and to structure a deal around that [indiscernible] we can get to terms. ***We'd like to find potentially a couple of large customers with large offtake requirements that we can then sort of just sole source that into those opportunities***. I think we said in our prepared remarks, we have something like 6 gigawatts of contracted backlog or something like that for Series 6 international still. So we've got some runway in terms of volume and absorption for those production assets, and then we'll continue to evaluate them as we learn more about some of these policy decisions that will be made.

41.    On November 14, 2025, First Solar issued a press release announcing that its new U.S. production facility would be located in South Carolina, "to onshore final production processes for Series 6 *Plus* modules initiated by the Company's international fleet." This press release

15

further stated that this facility "is scheduled to commence commercial operations in the second half of 2026", and quoted Defendant Widmar as stating, *inter alia*:

> "The passage of the One Big Beautiful Bill Act and the Administration's trade policies boosted demand for American energy technology, requiring a timely, agile response that allows us to meet the moment," said Mark Widmar, chief executive officer, First Solar. "*We expect that this new facility will enable us to serve the US market with technology that is compliant with the Act's stringent provisions, within timelines that align with our customers' objectives*."

42.    The statements referenced in ¶¶ 24–41 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: Defendants had overstated First Solar's capacity to manage the impact of U.S. tariff policy on the Company's business; (ii) Defendants understated the extent to which its responses to U.S. tariff policy, including the intentional underutilization of production facilities in Malaysia and Vietnam, and attempted relocation of production to the U.S., were likely to negatively impact First Solar's projected performance in the 2026 fiscal year; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

43.    The truth began to emerge on January 7, 2026, when Jefferies downgraded First Solar to Hold from Buy, noting that during 2025, the Company had lowered guidance, faced significant de-bookings and experienced margin compression through 2025.  Jefferies also flagged that "[international] facilities remain a pain point while tariffs exist" and "underutilization at [international] facilities remains a concern."  The Jefferies analyst also predicted that First Solar's deployment opportunities were likely to be more limited in 2026.

16

44.    On this news, First Solar's stock price fell $27.67 per share, or 10.29%, to close at $241.11 per share on January 7, 2026.

45.    Notwithstanding the foregoing disclosures and resulting drop in First Solar's share price, First Solar's stock continued to trade at artificially inflated prices due to Defendants' continued false and misleading statements about the challenges presented by a dynamic U.S. tariff policy, and the risk that that actions taken to address this dynamic policy landscape, including the intentional underutilization of production facilities in Malaysia and Vietnam, would negatively impact the company's projected performance in the 2026 fiscal year.

46.    For example, on February 23, 2026, First Solar issued a press release announcing it released an economic impact study concerning the Company's "estimated contributions to the U.S. economy" in 2027.  This press release announced that First Solar was projected to increase the number of its supported jobs "by almost 10,000 from 2025 to 2027" and an increased estimated contribution to U.S. gross domestic product, "from $5.8 billion in 2025 to $7.8 billion in 2027".

47.    This press release also quoted Defendant Widmar as stating that First Solar's economic impact study showed the Company could "deliver long-term economic value", just one day before the Company would release disappointing guidance for the 2026 fiscal year, stating, *inter alia*:

> "'This study demonstrates how genuinely American solar manufacturing can deliver long-term economic value at the intersection of national priorities such as energy dominance, affordable electricity, and economic prosperity,' said Mark Widmar, chief executive officer, First Solar."

48.    The statements referenced in ¶¶ 46–47 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: Defendants had

17

overstated First Solar's capacity to manage the impact of U.S. tariff policy on the Company's business; (ii) Defendants understated the extent to which its responses to U.S. tariff policy, including the intentional underutilization of production facilities in Malaysia and Vietnam, and attempted relocation of production to the U.S., were likely to negatively impact First Solar's projected performance in the 2026 fiscal year; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**The Truth Continues to Emerge**

49.     On February 24, 2026, First Solar issued a press release "announc[ing] financial results for the fourth quarter and year ended December 31, 2025." Among other items, First Solar announced earnings that missed expectations by a wide margin and issued lower-than-expected FY 2026 revenue guidance, citing customer headwinds such as permitting delays under the Trump administration.

50.     Specifically, Defendant Bradley announced net sales guidance between $4.9 billion and $5.2 billion, below consensus estimates of $6.16 billion, stating, *inter alia*:

> I'll now cover the full year 2026 guidance ranges . . . Our net sales guidance [is] between $4.9 billion and $5.2 billion. Gross margin is expected to be between $2.5 billion and $2.6 billion or approximately 49.5%, which includes $2.1 billion to $2.19 billion of Section 45X tax credits and $115 million to $155 million of ramp and underutilization costs.

51.     When introducing this guidance, Defendant Bradley explained that Defendants chose to run facilities in Southeast Asia "at low utilization rates this year despite the financial impact of doing so", stating, inter alia:

> Before turning to our financial guidance, I want to briefly reiterate our approach to managing the business amid a dynamic market policy and trade environment. . . . We entered 2026 with a fully allocated position for our U.S. production. Given tariff uncertainty, our India production is assumed to be sold into the India domestic market. We'll continue to monitor opportunities to export products into the U.S. where it is margin accretive to do so. Our guidance assumes our India facility

18

operating at full capacity with the ability to flex production as needed through the year in response to changes in demand signals. Demand for our Series 6 international products produced in Malaysia and Vietnam remains constrained. Our decision in Q4 of 2025 to establish a new finishing line in the U.S. allows us to make use of a portion of the front end of these Southeast Asian facilities, optimizing freight, tariffs and domestic content for the sale of incremental products into the U.S. domestic market. We intend to run our remaining end-to-end capacity in Malaysia and Vietnam at low utilization rates this year despite the financial impact of doing so, maintaining a near-term option to increase throughput should catalysts such as the political and regulatory matters discussed earlier, drive incremental profitable demand.

52.    Later during the FY 2025 Earnings Call, in response to a question asking Defendants to explain their Southeast Asia operations' expected performance in the coming year, Defendant Widmar reiterated this point, explaining that Defendants decided to strategically underutilize their operations in that region, "to try to sort of buy some time to see how these tariffs ultimately get played out", stating, inter alia:

> *[O]n the Southeast Asia, those factories are kind of running 20% or so. I mean they're extremely underutilized*. And what Alex said in his prepared remarks is that we're looking at this almost as option value. Now some of that capacity will be fully utilized once we get our South Carolina facility up because the front-end capacity for, call it, half of the Southeast Asia manufacturing will come to the U.S. So that will solve a piece of that underutilization. *The other half is going to continue to be underutilized at a very low utilization rate. But what we're looking at this is really an option to allow some of these potential tailwinds around 232 and other things to play itself out to see what the impact of that could be to create more demand for those international operations*. We also, I think, as we indicated in our last call, we are trying to work with a couple of counterparties on potentially meaningful volume offtake for those international production for that international production. But that's all still in the works. It's still going to be largely tethered back to what happens with the policy environment. *But we are incurring significant underutilization and cost headwinds because of what we're trying to do right now is figure out, let's create an option, let's evaluate what we continue to see in the market*. And we've been sort of wearing [sic] this for over a year now. One — it was about a year ago when these tariffs came in place, and we started to throttle down kind of towards the end of Q2, beginning of Q3, *and we've kind of run at a very low utilization rate to try to sort of buy some time to see how these tariffs ultimately get played out*.

53.     Following Defendants' revelations, several analysts lowered their respective price targets for First Solar's stock.  On February 25, 2026, Baird Research downgraded its stock to Neutral from Outperform, and reduced its price target approximately 22.3%, from $264 to $205, citing "several question marks in forward outlook" and noted that Defendants' comments during the FY 2025 Earnings Call left Jefferies "incrementally negative even vs. our lowered expectations".   On the same date, HSBC Global Investment Research downgraded its rating of First Solar from buy to hold and reduced its price target 24.6%, from $280 to $211, writing that a "lower-than-expected" and "weak FY26 guidance suggests cooling demand and operational challenges", and attributing this guidance to "less bullish US solar demand, i.e. federal permitting delay" and "operational challenges, including US tariffs, relocating production back to the US along with underutilization in Southeast Asia."   Deutsche Bank lowered its price target approximately 18.3%, from $300 to $245, writing "First Solar had a negative release on the 4Q result itself (6% EPS miss, 5% below DBe) and a weak 2026 outlook, 17% below Street expectations", and "[t]he disappointing 4Q results were impacted by (i) under-utilization costs related to the onshoring line in South Carolina (volumes exiting Southeast Asia) and (ii) a higher volumes mix coming from India at a lower margin overall".  On February 26, 2026, Jefferies lowered its price target approximately 21%, from $260 to $205, writing "FSLR's guide disappointed even versus (lower) reset expectations, with limited visibility on recovery".

54.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**Regulation S-K Item 105**

55.    Throughout the Class Period, First Solar's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations.  Specifically, Item 105 of SEC Regulation S-K, 17 CFR § 229.105 ("Item 105"), required First Solar to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the [Company] or offering speculative or risky" and "[c]oncisely explain how each risk affects the [Company] or the securities being offered."  Defendants failed to disclose, *inter alia*, the scope and severity of the risks that U.S. tariff policy posed to First Solar's business; and the extent to which First Solar's responses to U.S. tariff policy, including the intentional underutilization of production facilities in Malaysia and Vietnam, and attempted relocation of production to the U.S., risked negatively impacting the Company's projected performance in the 2026 fiscal year.  Defendants' failure to disclose the foregoing issue violated Item 105 because these issues represented material factors that made an investment in the Company speculative or risky.

**SCIENTER ALLEGATIONS**

56.    Defendants had both the motive and opportunity to commit fraud.  ***During the Class Period, the Individual Defendants enriched themselves by selling 106,793 shares of First Solar common stock for over $17.1 million in proceeds***.  Defendant Widmar sold 87,130 shares of First Solar common stock, collecting proceeds of approximately $14.1 million, while Defendant Bradley sold 19,663 shares of First Solar common stock, collecting proceeds of over $2.9 million.

57.    Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. Defendants repeatedly spoke to the underutilization of production facilities in Malaysia and

21

Vietnam, as alleged *supra* ¶¶ 29–30, 32–33, 35–36, and their attempts to relocate production to the United States, as alleged *supra* ¶¶ 38–39, 41, 46–47, without disclosing that this underutilization and attempted relocation was likely to negatively impact First Solar's projected performance in the 2026 fiscal year. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

58.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired First Solar securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

59.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, First Solar securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by First Solar or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

60.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

61.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

62.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of First Solar;

- whether the Individual Defendants caused First Solar to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of First Solar securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

63.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

23

64. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- First Solar securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold First Solar securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

65. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

66. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

67. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

68.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

69.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of First Solar securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire First Solar securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

70.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for First Solar securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about First Solar's finances and business prospects.

71.    By virtue of their positions at First Solar, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended

25

thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

72.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of First Solar, the Individual Defendants had knowledge of the details of First Solar's internal affairs.

73.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of First Solar. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to First Solar's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of First Solar securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning First Solar's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired First Solar securities at artificially inflated prices and relied upon the price of

26

the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

74.    During the Class Period, First Solar securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of First Solar securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of First Solar securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of First Solar securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

75.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

76.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

77.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

78.    During the Class Period, the Individual Defendants participated in the operation and management of First Solar, and conducted and participated, directly and indirectly, in the conduct of First Solar's business affairs.  Because of their senior positions, they knew the adverse non-public information about First Solar's misstatement of income and expenses and false financial statements.

79.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to First Solar's financial condition and results of operations, and to correct promptly any public statements issued by First Solar which had become materially false or misleading.

80.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which First Solar disseminated in the marketplace during the Class Period concerning First Solar's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause First Solar to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of First Solar within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of First Solar securities.

81.    Each of the Individual Defendants, therefore, acted as a controlling person of First Solar.  By reason of their senior management positions and/or being directors of First Solar, each

of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, First Solar to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of First Solar and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

82.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by First Solar.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  June 23, 2026

Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044

jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff*

**CERTIFICATION PURSUANT
TO FEDERAL SECURITIES LAWS**

1.      I, __Claire Day_____, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against First Solar Inc. ("First Solar") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire First Solar securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired First Solar securities during the Class Period as specified in the Complaint, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in First Solar securities during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the Class as set forth in the Complaint, beyond my *pro rata* share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.      I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

**Executed** __6/3/2026_____
                        **(Date)**

                                        DocuSigned by:

                                        *Claire Day*
                                        —6BF0F005603649D...
                        _____
                                        **(Signature)**

                        Claire Day
                        _____
                                        **(Type or Print Name)**

**First Solar, Inc. (FSLR)**                                                                                   **Claire Day**

### List of Purchases/Acquisitions and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase/Acquisition | 1/27/2026 | 5 | $242.5000 |
| Purchase/Acquisition | 1/27/2026 | 5 | $240.7400 |
| Purchase/Acquisition | 1/27/2026 | 5 | $240.0100 |
| Purchase/Acquisition | 1/27/2026 | 5 | $239.5000 |
| Purchase/Acquisition | 1/27/2026 | 5 | $238.0200 |
| Purchase/Acquisition | 1/29/2026 | 20 | $239.5000 |
| Purchase/Acquisition | 1/29/2026 | 10 | $236.8000 |
| Purchase/Acquisition | 1/29/2026 | 10 | $215.1450 |
| Purchase/Acquisition | 1/29/2026 | 10 | $214.8600 |
| Purchase/Acquisition | 2/6/2026 | 10 | $216.0100 |
| Purchase/Acquisition | 2/11/2026 | 30 | $225.0100 |
| Purchase/Acquisition | 2/12/2026 | 20 | $225.0100 |
| Purchase/Acquisition | 2/19/2026 | 10 | $232.8500 |
| Purchase/Acquisition | 2/20/2026 | 20 | $230.5000 |
| Purchase/Acquisition | 2/23/2026 | 20 | $239.8000 |
| Purchase/Acquisition | 2/24/2026 | 20 | $239.0500 |
| Purchase/Acquisition | 2/24/2026 | 20 | $237.0900 |
| Purchase/Acquisition | 2/24/2026 | 20 | $236.0100 |
| Purchase/Acquisition | 2/24/2026 | 30 | $234.0400 |
| Purchase/Acquisition | 2/24/2026 | 10 | $218.3280 |
| Sale | 1/28/2026 | (5) | $241.9000 |
| Sale | 1/28/2026 | (5) | $242.8000 |
| Sale | 1/28/2026 | (5) | $243.0100 |
| Sale | 1/28/2026 | (5) | $244.4000 |
| Sale | 1/28/2026 | (5) | $245.3500 |
| Sale | 1/30/2026 | (10) | $224.0100 |
| Sale | 2/3/2026 | (10) | $238.0100 |
| Sale | 2/3/2026 | (20) | $239.0900 |
| Sale | 2/3/2026 | (10) | $242.8000 |
| Sale | 2/10/2026 | (10) | $223.8900 |
| Sale | 2/12/2026 | (20) | $230.0100 |
| Sale | 2/13/2026 | (10) | $226.9500 |
| Sale | 2/13/2026 | (20) | $228.5000 |
| Sale | 2/20/2026 | (10) | $235.0500 |
| Sale | 2/20/2026 | (20) | $238.0100 |
| Sale | 2/23/2026 | (20) | $245.0000 |
| Sale | 2/24/2026 | (20) | $245.0100 |
| Sale | 2/24/2026 | (10) | $216.2800 |